TYLER SMITH, OSB No. 075287
Tyler Smith & Associates, P.C.
181 N. Grant St., Suite 212
Canby, OR 97013
Tel. No. 503-266-5590
Fax No. 503-212-6392
E-mail: Tyler@RuralBusinessAttorneys.com
Of Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| DEREK  SCHUMACHER,<br><br>Plaintiff,<br><br>v.<br><br>J.R. SIMPLOT COMPANY, a Nevada Corporation, dba JACKLIN SEED<br><br>Defendant. | Case No.  6:21-cv-00489-MC<br><br>**THIRD AMENDED COMPLAINT**<br><br>(Wrongful Termination: Constructive Discharge; Violation of ORS 659A.199)<br><br>Not Subject to Mandatory Arbitration<br>Jury Trial Requested<br><br>Claim for Damages $900,000 |

Plaintiff alleges:

## **JURISDICTION AND VENUE**

1.

Plaintiff Derek Schumacher at all relevant times was a resident of Marion County

Oregon, and from approximately 1997 to about February 12, 2019 was an employee of Jacklin

Seed Company ("Jacklin" or "Defendant" hereafter), operating out either from his home, or a

vehicle or out of  office in Albany in Linn County Oregon, which at the relevant time was a

wholly owned subsidiary, and dba of J.R. Simplot Company which is registered in the State of

Oregon as a foreign business corporation from Nevada.  Plaintiff requests a jury trial in this

matter.

**Page 1 – Third Amended Complaint**

2.

Venue is appropriate in a Marion County Circuit court because many of the events giving rise to this complaint occurred in Marion County, and Linn County Oregon and Plaintiff resides in Marion County Oregon. All conditions precedent to the institution of this lawsuit have been met.

3.

In early 2020 Plaintiff filed complaints of employment discrimination, wrongful discharge, constructive discharge and unlawful employment practices against Jacklin with the Oregon Bureau of Labor and Industries ("BOLI"). After January 12, 2021 Plaintiff obtained a "right to sue" letter from BOLI. Jurisdiction is appropriate for this Court and timely after Plaintiff's receipt of right to sue notices from BOLI which was dated January 12, 2021.

**FACTUAL ALLEGATIONS**

4.

Plaintiff was employed for nearly 22 years by Jacklin Seed Company, which was acquired or otherwise became a dba of Defendant JR Simplot Inc. in about 1997 ("Defendant" for all purposes of this lawsuit). Defendant is a very large employer in the United States, believed to employ thousands upon thousands of employees and Plaintiff had various direct and indirect supervisors who were his supervisors, his supervisors' supervisors and the general managers of the various departments and locations (collectively "Defendant").

5.

Plaintiff was the grass seed production grower services field consultant for Defendant who is one of the largest agricultural companies in the world, buying one of the largest crops produced in the State of Oregon. During the time period of 2018 and 2019, Plaintiff suspected that Defendant was intentionally violating rules, laws or being dishonest. Later, after years of

**Page 2 – Third Amended Complaint**

concealment, Plaintiff was unable to uncover the "Unlawful Activity" that Defendant was engaged in through its agent's actions. Defendants created workings conditions such as forcing employees to lie, mislabel bags, hide information, be scared for their job and scared for their safety that forced Plaintiff, and employees like Plaintiff to begin to ask questions about the working conditions, and policies and practices that Defendant had created that appear to be unethical, dishonest, untrue and potentially civil or criminal actions. In the summer of 2018 Plaintiff started to inquire into these issues, publicly draw attention to these workplace conditions and faced adverse employment actions as a direct and proximate result. The adverse employment actions continually ratcheted up until Plaintiff had not choice but to quit. As described below Defendant's agents made statements to Plaintiff in January of 2019 that indicated Plaintiff was being forced out or would be terminated. Defendant itself and by and through Plaintiff's supervisors maintained those conditions and intentionally continued them and hid the full nature of the Unlawful Activity by Defendant and Defendant's agents, employees and Plaintiff's supervisory chair so that Defendant could profit and Defendant's agents could profit from the Unlawful Activity. Defendants then continued those working conditions and made them so intolerable that Plaintiff had to resign as he could no longer do his job, was made to fear for his own personal safety and was being forced out of the company in an intentional effort by Defendant to hide, cover up and conceal the Unlawful Activity. Defendant and some of Plaintiff's supervisors, supervisor's supervisors, and company management were and appear to still be concealing the recent discovery that Defendant and some of Defendant's employees were in fact violating state and federal laws, committing fraud, and committing other actions (collectively the Unlawful Activity), and incorporates by reference the crimes confessed to in *United States v. Christopher Claypool*, United States case 3:21-cr-00062-IM, document 7, which would allow Defendant and its agents to profit from those actions. As late as March of 2021, and

**Page 3 – Third Amended Complaint**

continuing, some of Defendants agents, employees or former employees appear to have been concealing the matters as they are in criminal trials or criminal proceedings. Plaintiff incrementally learned portions of what has now been discovered and he slowly began to suspect, and then uncover that employees were falsifying seed tests, intentionally mislabeling seed bags, falsifying product labels, and falsifying the contents of seed bags. Shortly before Plaintiff was forced to quit he discovered that the Unlawful Activity was being covered up, and now understands that he was being targeted for looking into the Unlawful Activity by asking questions and raising concerns and complaints to supervisors. Some of the Unlawful Activity, included has been discovered to be crimes and were violations of Oregon Revised Statutes Chapter 633, wire fraud, violations of the Federal Seed Act, fraud and more. Some of these employees have been charged criminally for their actions. Numerous Oregon Administrative rules in Chapter 603 specifically outlaw the practices which Defendant, through some of its employees, was engaged in. Some specific legal requirements that were violated include OAR 603-056-0460 and OAR 603-056-048. Defendant has now issued apology letters to its growers and worldwide customers which constitute admissions admitting this wrongdoing took place. The concealment of the reason for the retaliation, cover up, and workplace conditions largely ended by the time of the criminal indictments around the end of February 2021 and by then Plaintiff had enough information to validate that the previous actions taken against him were retaliation, and part of Defendant's agents attempts to conceal, and cover up and hide the Unlawful Activity, crimes and violations. Some former employees are currently in active criminal proceedings relating to their actions so new facts continued to be discovered relating to the concealment and retaliation against Plaintiff. The amounts of money at stake was in the range of multiple millions of dollars. It has now been publicly disclosed in filings by United States Attorney, Billy Williams, that as of February 24, 2021 that there was allegedly a conspiracy to

**Page 4 – Third Amended Complaint**

commit wire fraud and money laundering as parts of multiple schemes. Defendant through its employees at the time, and after Plaintiff was forced to leave, concealed, hid and mislead Plaintiff, mislead Defendant's customers, and other employees about the Unlawful Activity. The full scope of all of the wrongdoing is still not even fully known or disclosed but Plaintiff now has sufficient information to know he was retaliated against and force to quit to aid Defendant in continuing the Unlawful Activities that were the workplace practices.  On February 12, 2019 Plaintiffs employment was terminated.  By February 11, 2019 Plaintiff had been threatened, badgered, bullied, harassed, had job duties removed, been kept out of meetings he should be in, lost benefits and perks, been retaliated against, and damaged by Defendant, acting through its then employees who were engaged in, and covering up these Unlawful Activities in the scope and course of their employment and roles as agents of Defendant by trying to, deflect, conceal, silence, removed, and intimidate Plaintiff.

6.

Plaintiff first began to notice suspicious activity he was told that the Albany warehouse had re-bagged Canadian seed "Boreal" into "Audubon" red fescue bags (as Defendant produced Audubon Red Fescue only in the Willamette Valley of Oregon). When he heard about these actions, Plaintiff started to ask trying to uncover whether it was just a mistake or mismanagement. For years, Plaintiff's inquiry into these suspicions did not result in any retaliation. In July of 2018 Plaintiff received actual records showing proof this was happening. As time when on, and through to the time of Plaintiff's forced termination on February 11, 2019, and ever afterward, Plaintiff was trying to uncover the layers of issues by asking probing questions and notifying his superiors. Plaintiff had started to fear that the Unlawful Activity might be criminal or subject to fines.  Plaintiff also feared that someone might think he was involved since he was the seed buyer. When his direct superior was unable to rectify the situation

(because Plaintiff's second level boss was participating in the illegal activity and the cover up and retaliation) he notified his bosses'superiors, and was at first ignored. The the retaliation started. The workplace practices and conditions continued through the badgering, bullying and intimidation, including the denial of information, removal of communication access in December of 2018, blocking of access to the computer systems, denying physical access to the office and other statements included herein. In late 2018 and 2019 Plaintiff began to suspect, and later discovered some additional aspects of the Unlawful Activity and then Plaintiff notified his superiors and asked open question in larger groups. Shortly thereafter his computer was removed in late 2018, and not restored for a few months later. In November and December 2018 he was denied computer access and then was removed from meetings in early 2019. It was not until after Plaintiff's employment was terminated that Plaintiff uncovered the full nature of the Unlawful Activity and confirm the fact that his suspicions that crimes might be-being assisted by the working conditions established there and being allowed by Defendant. Defendant's Unlawful Activities were authorized and permitted by the employees of Defendant within the scope of their employment. Plaintiff did not know, and could not have known, what Defendant was covering up until after he was terminated and forced to resign. Defendant had been covering, up, concealing and hiding the facts and circumstances relating to the re-bagging, mislabeling, and giving false information for the reasons for their actions against Plaintiff and giving false and misleading explanations about why there was no corrective actions being taken about the workplace conditions and concerns. While he was still employed, Plaintiff began to inquire more and more, even expressing concerns and complaints and report the facts constituting the Unlawful Activity in meetings, but was told to shut up and keep quiet. Plaintiff ultimately reported to government enforcement officers which resulted in prosecutions. Plaintiff's jobsite location had no human resources department so he even tried to alert, notify and tell various

**Page 6 – Third Amended Complaint**

office managers and supervisors, including escalating support tickets, trying to find out why this was happening to him and get it to stop.  Plaintiff was then labeled as a troublemaker by his supervisors, who on behalf of Defendant orchestrated, managed and set up the employment conditions, refused to correct the Unlawful Activity, and directed the retaliation, including specifically Chris Claypool, Rick Dunham and Scott Cargill (who are the ones understood to have been engaged in the criminal enterprise) who were all agents of Defendant.  When Plaintiff starting inquiring, complaining and pointing out these issues in the fall of 2018, Plaintiff began to face specific acts of retaliation from Defendant and Defendant's agents. Plaintiff was kept away from corporate higher-ups from Boise.  However, from the fall of 2018 even through February 4, 2019 Plaintiff continued to raise this issue, make complaints and notify superiors within the very large company in order to both stop the Unlawful Activity and to stop the harassment and retaliatory actions against himself, to no avail, and the retaliation escalated the closer and closer Plaintiff came to understanding what was going on.  Plaintiff was afraid he might be accused of being part of the crimes he suspected were being committed.  Plaintiff was afraid for the safety of himself and his family because he knew the high dollar values (in the hundreds of millions) that were at stake in what at the time he suspected were the Unlawful Activities.  The acts of retaliation continued to escalate until Plaintiff had no choice but to end his employment as of February 12, 2019, with his last day being February 11, 2019 and separate himself from the Unlawful Activities, even though he never personally participated in them.

7.

On January 1, 2019 Plaintiff's direct supervisor Glenn Jacklin announced his early retirement. Glenn Jacklin had been Plaintiff's last hope in management that he would do something to stop the retaliation or rectify the actions that were believed to be the Unlawful Activities.  Until Glenn Jacklin left the company on or around February 1, 2019 Plaintiff

believed that there might be alternatives to get the Unlawful Activity and unlawful practices to stop and to get the employer to cease the hostile working conditions. After January 1, 2019, Plaintiff was told, "Once Glenn is gone things are going to change around here", with the implicit tone that things were going to get bad for Plaintiff and that he would be terminated, laid off, or simply have no role. After January 1, 2019 Plaintiff was told by company employees that since Glenn Jacklin was no longer there to protect Plaintiff, that "things were going to get very bad for him now". On and after January 25, 2019 Plaintiff was then left completely out of production meetings that were going over future plans following Glenn Jacklin's departure. One specific key meeting Plaintiff knows about was on January 25, 2019. Since Plaintiff was the only production person in Oregon, his exclusion was a demonstration to Plaintiff that he was not going to have a position in the company, since his role was essential to the company. Plaintiff knew a termination was coming as retaliation in order to silence him. On one particular day, to be determined at trial, but believe to be in the last days or weeks before Plaintiff resigned, Plaintiff received an allegedly pressing phone call from Glenn Jacklin's supervisor implying that Plaintiff was "an entrepreneur and would be fine no matter what direction they decided to go as a company". On the date of his effective resignation on February 11, 2019 Plaintiff was justifiably concerned he would be fired, face more retaliation, or become caught up in whatever schemes or wrongdoing was going on with Defendant's workplace practices and conditions. In 2019, around the time Plaintiff had to resign Plaintiff had some other employees disclose to him in more about the details of Defendant's Wrongdoing. On February 3, 2019 in further efforts to try to stop the Unlawful Activity and the workplace practices and conditions by writing a letter to Chris Claypool because at that time Plaintiff did not know that Chris Claypool was directly involved in the Unlawful Activity. Plaintiff continued to investigate and to then notify government officials.

**Page 8 – Third Amended Complaint**

8.

At no time during his employment was Plaintiff, and to the best of Plaintiff's knowledge any other employee, provided a copy of the Federal Seed Act, and that was among other things hidden from Plaintiff.  Plaintiff was left in continual guessing game about the full nature of the liability, crimes, risk, and/or danger that Defendant was creating by allowing what turned out to be Unlawful Activities.

9.

For approximately a full year Plaintiff escalated his inquiries, from investigating the actual seed mislabeling issues around April of 2018, to then whistleblowing in later 2018 about the facts that he heard from other individuals and reporting concerns to supervisors, co-employees, managers in other divisions and then after being forced out of the company, then eventually to government agencies.  Plaintiff did not understand at first, why he was being retaliated against by Defendant and some of the supervisors.  One of Plaintiff's good supervisors contacted higher-up supervisors like Chris Claypool to try to mediate and have Scott and Rick back-off of Plaintiff, but it has recently been discovered that Chris Claypool (who was that supervisor) was apparently in on the concealment and Unlawful Activities.  The retaliation, bullying, harassment and threats that Plaintiff received in 2019 were approved or condoned working conditions by these supervisors who were engaged in the Unlawful Activities.  But by December of 2018 and into January of 2019 Plaintiff had essentially been shut out in retaliation. Other employees even quit in relation to the Unlawful Activities and working condition that were taking place and existed at the Company.  Some employees send Plaintiff copies of e-mails discussing moles in the Company who were participating in the Unlawful Activity and those who were merely involved in making the workplace intolerable due to the lies and fraud.  In what is now understood to have been part of the direct retaliation and attempts at concealment for

Case 6:21-cv-00489-MC    Document 16    Filed 09/10/21    Page 10 of 19

Plaintiff asking questions, reporting issues, and discussing the possible law violations, Plaintiff was physically locked out of the local office and was not given the alarm code to be able to physically access the office.  Plaintiff's computer was taken away throughout the summer and fall of 2018 and IT could not get approvals from Scott Cargill to get the work done even after multiple IT requests.  In fall of 2018 Scott Cargill had told IT that Plaintiff did not need a computer, even though Plaintiff's own supervisor said he did need a computer. Plaintiff had to physically go to the office in early 2019 to troubleshoot to find out that his computer had been manually disconnected.

10.

Starting July 16, 2018 and not resolved until January 2019, in what is now understood to have been a blocking of Plaintiff's access to information and a direct retaliation for his whistleblowing, and to assist in the attempts to conceal Defendant's Unlawful Activity, first Plaintiff had his entire computer removed in July of 2018.  Then Plaintiff had his access to his computer taken away so he could no longer file or submit his expense reports, weekly reports, field records, projections or perform other essential job functions. Plaintiff was forced to try to perform a contract buying job without a computer and without the capabilities necessary to perform his job functions.  In the beginning of 2019 other supervisors even attempted to assist in getting him access, and a new computer and more sudden IT roadblocks and obstacles were created by Defendant and Defendant's agents to block Plaintiff's access to information up until the time Plaintiff left.  While he was still employed, Plaintiff tried to rectify this by raising the concerns and issues to supervisors as he tried to uncover what was happening, change the workplace conditions and resolve why it was happening.  Eventually Plaintiff uncovered that it was an attempt to retaliate and not allow Plaintiff to have access to seed information and force him to be unable to do his job and leave, but Plaintiff persisted until he had no other alternative

available but to quit.

11.

For approximately a year before termination, and continuing to the present, Plaintiff could not sleep was suffering severe stress, fear of being arrested, insecurity about not knowing what all was actually happening, nor why it was happening, and with frustration for not being able to find out what was going on.  Even before he blew the whistle, and before he ultimately resigned, Plaintiff had fear for his own and his families personal safety, and Plaintiff finally sought medical supervision related to the anxiety and physical medical symptoms he was suffering due to the retaliation and refusal of Defendant to rectify the Unlawful Activities. Plaintiff was required by company policy to grow grass seed on his own farm and sell that seed to Jacklin while employed there for nearly 22 years, which Plaintiff feared forced him to indirectly participate in the illegal activities or be terminated.  In, addition, some of the other workplace practices that have now been fully uncovered were that employees in the sales office that Plaintiff was a part of were forced to illegally and falsely label seed as "Oregon Grown" when it was imported seed from Canada to make the company larger profits.  These other employees have told Plaintiff that they were told that they had to do it or they would be fired, and thus Plaintiff was justified in believing that the Defendant would and was willing to take punitive and retaliatory actions against him.

12.

Feeling that he had no other choice, than to risk fines, jail, physical injury to himself or his family and other liability for knowing about what turned out to be crimes and the Unlawful Activities taking place, and fearing further retaliation, and certain termination, Plaintiff was forced to resign. On February 1, 2019 Plaintiff tendered his letter of resignation effective February 11th as his last official day.  After submitting his letter of resignation, while he

**Page 11 – Third Amended Complaint**

remained on payroll until later, and after he was no longer employed, Plaintiff continued to blow the whistle on the Unlawful Activity, both internally and externally to try to get Defendant to come clean, right the ship, cease its Unlawful Activity.  Plaintiff hoped the company could resume the once great reputation that Jacklin Seen Company had for many years before that and before the Unlawful Activity began to take place.  Plaintiff was still under the impression that the company might be able to fix, remedy or clean out the wrongdoing and reasons he was forced to leave.  However, for months, and months, Defendant denied, hid and tried to cover up the scope and nature of  the Unlawful Activity, despite Plaintiff's continued inquiries.  Plaintiff filed for and finally obtained unemployment compensation over Defendant's objections and during this process through 2019 and during that process in 2020 Plaintiff uncovered more and more about Defendants actions, finally understanding that Plaintiff was correct about his initial suspicions and reasons he was compelled to leave the company.  The full nature of the Unlawful Activity finally began to come out slowly and in different ways including but not limited to an apology letter on May 8, 2020, and the criminal cases in 2021.  Between May of 2020 and February of 2021 Plaintiff finally had enough information to discover he was correct that he was being forced out because he had successfully blown the whistle, and because he was resisting the Unlawful Activities.  Plaintiff was denied access to computers, HR, and the ability to get reimbursed for expenses he paid on behalf of the company in the amount of $6,700, relating to expenses paid to improve a Company vehicle and other ordinary expenses, but the retaliation, and termination cut-off that ability

13.

As a direct and proximate cause of Defendant's actions via its constructive discharge and retaliation caused financial injury to Plaintiff and economically harmed Plaintiff in an amount to be proven at trial, but estimated to be more than $98,966.40 per year which was his salary at the

**Page 12 – Third Amended Complaint**

time of termination, plus benefits, including a company vehicle, medical and dental care for damages to be determined at trial but estimated at $120,000 per year, for each year until the losses can be mitigated and the income replaced currently $240,000 in total and continuing on an ongoing basis to the age of retirement. There are very few seed production companies in Oregon where Plaintiff could perform his same services and it will be difficult to find a full replacement income. Plaintiff has mitigated and attempted to mitigate damages the best he can. Plaintiff seeks damages of at $120,000 per year and estimated to be at least $900,000 for amounts lost during the last two years and replacement income that Plaintiff will need to cover the difference between his income with Defendant and his replacement income. Plaintiff is also owed approximately $5000 in unreimbursed expenses that he was unpaid. Plaintiff is also entitled to statutory attorney fees for some of his claims pursuant to ORS 659A.199 and ORS 659A.203. Plaintiff is continually looking for replacement work, attempting for find employment and to mitigate damages.

## FIRST CLAIM AGAINST DEFENDANT

(Wrongful termination - Constructive Discharge)

14.

Plaintiff re-asserts the facts and allegations in paragraphs 1 through 13 above as if fully set forth herein.

15.

Defendant intentionally created and maintained working conditions by taking away Plaintiff's tools, access to information, access to the office and ability to perform his job because of his complaints and whistleblowing about Defendant's Unlawful Activity. In 2019 Defendant's employees, and Plaintiff's supervisors informed Plaintiff that he better quit or things were going to get even worse for him at his job. The conditions, including the cover up and

denial of the Unlawful Activity and Plaintiff being forced to hide the Unlawful Activity and continue to buy seed that he knew would be mislabeled and re-sold in violation of the law, were intolerable conditions, that a reasonable person would have resigned rather than participate in a scheme to break the law. Plaintiff was forced to both "resign or be fired" and the workplace conditions, retaliation, and risk of being caught up in the Unlawful Activity was so severe and intolerable that Plaintiff had no choice but to quit.  Plaintiff did leave on February 11, 2019 due to the working conditions and retaliation that he faced, and the continued ratcheting up of the adverse employment actions removing Plaintiff's access, excluding him from meetings, taking away his computer, denying him the ability to perform his job and overall making performance impossible.  Defendant performed these actions through its employees and agents in the scope of their employment who were Plaintiff's supervisors, and who intended to force and pressure Plaintiff to quit.

16.

As a direct and proximate result of Defendants' acts and omissions stated in each Count in this First Claim for Relief, Plaintiff has sustained economic damages in the form of past and future loss of income and earnings, including wages and employment benefits, health insurance and retirement benefits and contributions, in an amount to be proven at trial; and non-economic damages in the form of past and future emotional distress, anxiety, loss of self-esteem and damage to reputation, in an amount to be proven at trial.

17.

Plaintiff has suffered specific economic and non-economic damages due Defendant's conduct. As a result of Defendant's actions, Plaintiff requests equitable relief, economic damages in the amount of at least $900,000, and compensatory damages to be determined by a jury at the time of trial in addition to costs and disbursements. Plaintiff's economic damages continue to

**Page 14 – Third Amended Complaint**

accrue at the rate of approximately $8,270 per month in lost compensation. Plaintiff is also entitled to unpaid expense reimbursements from his employment. Plaintiff is entitled to reasonable attorney fees in this action.  Plaintiff is entitled to economic damages in the amount of $900,000 in lost future earnings and reduced replacement income, and an amount to be proven at trial for injury to reputation by being indirectly associated with Defendants actions.  Plaintiff was the person who blew the whistle and faced retaliation and is entitled to all the common law and statutory remedies available under ORS 659A.885 including injunctive relief, back pay, compensatory damages to be determined by a jury or finder of fact.

## <u>SECOND CLAIM AGAINST DEFENDANT</u>

### (Whistleblowing Count I—Violation of ORS 659A.199; 659A.230)

18.

Plaintiff realleges paragraphs 1-17 as if set forth fully herein.

19.

According to ORS 659A.199, "[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule, or regulation."; ORS 659.A230 states, "[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good

**Page 15 – Third Amended Complaint**

faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial".

20.

Defendant is an employer pursuant to ORS Chapter 659A.199 and .200 et seq.

21.

Plaintiff made inquiries, complaints, and asked probing questions relating to the Unlawful Activity alleged above that Plaintiff reasonably believed were wrong, and have been proven to be evidence of criminal laws and violations of state or federal law, rule or regulation, with such Unlawful Activity including, but not limited to:

    a.  Violations of ORS Chapter 633.511 to .750

    b.  OAR Chapter 603 including but not limited to OAR Chapter 603-056-0460, OAR 603-056-0480;

    c.  Fraud;

    d.  Conspiracy to commit fraud;

    e.  Misrepresentation;

    f.  Conspiracy to commit wire fraud;

    g.  Money laudering; or

    h.  Conspiracy to commit money laundering;

    i.  Federal Seed Act.

22.

In January and February of 2019, Plaintiff was retaliated against for opposing these practices, and for engaging in this protected activity as alleged above.  Defendant and some of Plaintiff's supervisors retaliation against Plaintiff was directly connected to Defendant's agents attempts to hide and cover up their unlawful employment practices and illegal activities. The actions of Defendant constitute a violation of ORS 659A.199 and ORS 659A.230.

23.

**Page 16 – Third Amended Complaint**

Plaintiff has suffered economic and non-economic damages due Defendant's conduct. As a result of Defendant's violations of ORS 659A.199 and 659A.230, Plaintiff requests equitable relief, economic damages in the amount of at least $900,000, and compensatory damages to be determined by a jury at the time of trial in addition to costs and disbursements. Plaintiff's reputation and ability to find similar work was damaged in an amount to be proven at trial by Defendant's actions that indirectly associated Plaintiff, even though Plaintiff was the person who blew the whistle and tried to stop the Illegal Actions.  Plaintiff's economic damages continue to accrue at the rate of approximately $8,270 per month. Pursuant to ORS 659A.885 and ORS 20.107, Plaintiff is entitled to reasonable attorney fees in this action.

WHEREFORE, Plaintiff prays for a Judgment in favor of Plaintiff, a Money Award as follows in addition to equitable relief, costs, and reasonable attorney's fees for his claims against Defendants as delineated below:

1. **For Plaintiff's First Claim for Relief a Judgment and Money Award for:**

    A. Economic damages in the amount of at least $120,000 per year including back pay, benefits, and compensatory damages estimated to be $900,000 and determined by a jury at the time of trial for future lost earnings. Plaintiff's economic damages continue to accrue at the rate of approximately $8,270.00 per month from the date of termination, plus $6700 in unreimbursed expenses.

    B. Reasonable attorney fees and costs and disbursements in this action.

2. **For Plaintiff's Second Claim for Relief a Judgment and Money Award for:**

    A. Economic damages in the amount of at least $240,000 including back pay, benefits, and compensatory damages to be capped at $900,000 and determined by a jury at the time of trial. Plaintiff's economic damages continue to accrue at the rate of $8,270.00 per month from the date of termination, plus $6700 in

unreimbursed expenses.

B.  Pursuant to ORS 659A.885 and 20.107, Plaintiff requests reasonable attorney fees

and costs and disbursements in this action.


DATED this 10th day of September, 2021.

TYLER SMITH & ASSOCIATES, P.C.

 s/ Tyler Smith
TYLER SMITH, OSB No. 075287
Tyler Smith & Associates, P.C.
Tel. No. 503-266-5590
Fax No. 503-212-6392
E-mail: Tyler@RuralBusinessAttorneys.com
Of Attorneys for Plaintiff

**Page 18 – Third Amended Complaint**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of September, 2021, I caused a true copy of

Plaintiff's **THIRD AMENDED COMPLAINT** to be served upon the following named parties

or their attorney by CM/ECF electronic service and e-mail:

Ryan Kunkel
Stoel Rives, LLP
760 SW Ninth Ave. STE 3000
Portland, OR 97205
Attorney for Defendant


DATED this 10th day of September, 2021.

TYLER SMITH & ASSOCIATES, P.C.

s/ Tyler Smith
TYLER SMITH, OSB No. 075287
Tyler Smith & Associates, P.C.
Tel. No. 503-266-5590
Fax No. 503-212-6392
E-mail: Tyler@RuralBusinessAttorneys.com
Of Attorneys for Plaintiff

**Page 19 – Third Amended Complaint**